[Civ. No. 15382.   First Dist., Div. One.   July 28, 1953.]

AMOS PAXTON, Respondent, v. THE COUNTY OF ALAMEDA et al., Appellants.

J. F. Coakley, District Attorney, R. Robert Hunter, Assistant District Attorney, Richard H. Klippert, Deputy District Attorney, Donahue, Richards, Rowell & Gallagher, James E. Gallagher and Joseph T. Richards for Appellant County.

Gardiner Johnson, Samuel C. Shenk and John A. Sproul for Appellants Hass and Kent.

Robert E. Burns and Crimmins, Kent, Draper & Bradley as Amici Curiae on behalf of Appellants.

Anderson & Peck, Milner J. Anderson, Edward F. Peck and Gordon W. Nelson for Respondent.

WOOD (Fred B.), J.—Amos Paxton was injured while applying a tar and gravel surface to the roof of a livestock pavilion which was in course of construction at Alameda County Fair Grounds. He was carrying two 50-pound buckets of hot tar along the roof toward the place of intended application. At a certain point the sheathing under his left foot gave way. He fell through up to his thigh, sustaining injuries to his left arm, wrist and hand from the spilling of hot tar. He was in the employ of a roofing subcontractor at the time. He brought this action and recovered judgment for $25,000 against the county of Alameda and against Andrew T. Hass and Thomas J. Kent, individually and as copartners, the architects who designed the pavilion and prepared the plans and specifications for it. The defendants have appealed.

As to the architects, plaintiff claims that Hass was negligent in specifying 1″ x 6″ sheathing with a spread of 30″ between the rafters, that such was too thin a covering for such a span, resulting in a dangerous and defective condition for workmen who were to apply the tar and gravel surface, facts which Hass knew or should have known.

As to the county, plaintiff claims that it was equally negligent in this respect because its governing body, the board of supervisors, approved the plans and specifications; additionally, that a considerable amount of sheathing of lower

grade than specified was actually used and the county was chargeable with notice thereof through agents appointed by it to supervise and inspect the work of construction as it progressed.

In support of the appeals the several defendants and the California Council of Architects as amicus curiae advance various points which present the following issues: (1) Does the evidence sustain the implied finding that the defendants were negligent? (2) Was the failure of the general contractor to comply with the specifications as to the grade of lumber used a supervening act which broke the causal connection? (3) Did plaintiff fail to exercise due care for his own safety? (4) Were the damages awarded excessive in amount? (5) Did the trial court commit prejudicial error (a) by allowing the county to cross-examine defendant Hass, (b) by, assertedly, refusing to permit inquiry concerning plaintiff's second injury, and (c) by giving its instruction to the jury concerning future losses?

(1) *Does the evidence sustain the implied finding that the defendants were negligent?*

*As to the architect,*\* the issue is framed by the allegations of the complaint that the plans and specifications were so carelessly and negligently drawn that they called for construction and use of materials that were unsafe and dangerous and that the construction based thereon was dangerous and unsafe "in that the materials specified . . . for the sheathing thereon was of insufficient strength to support workmen such as plaintiff who would go thereon."

The test used during the course of the trial for determination of the negligence, if any, of the defendant architects is reflected by the instruction thereon to which none of the parties has taken exception: "By undertaking professional service to a client, an architect impliedly represents that he possesses, and it is his duty to possess, that degree of learning and skill ordinarily possessed by architects of good standing, practicing in the same locality. It is his further duty to use the care ordinarily exercised in like cases by reputable members of his profession practicing in the same locality; to use reasonable diligence and his best judgment in the exercise of his skill and the application of his learning, in an

---

\*Defendant Hass prepared the plans and specifications for the pavilion under contract with the county of Alameda but it was stipulated during the trial that Hass, Kent and the copartnership of Kent and Hass be treated as one for the purposes of this action.

effort to accomplish the purpose for which he is employed. . . . In determining whether the defendants architects' learning, skill and conduct fullfilled the duties imposed by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own. The standard is that set by the learning, skill and care ordinarily possessed and practiced by others of the same profession in the same locality, at the same time. It follows, therefore, that the only way you may properly learn that standard is through evidence presented in this trial by other persons in the field of architecture, called as expert witnesses. . . . Accordingly, in considering your verdict as to the liability of the defendants architects, you are entitled to consider only evidence, if any, which would support that specific charge of alleged negligence, namely, the charge that said architects were negligent in specifying sheathing of insufficient strength to support the workmen who would go on it.''

The plans and specifications called for Douglas Fir select, merchantable, seasoned sheathing 1'' x 6'' (sized four sides, making a net dimension of 25/32'' x 5-5/8'') laid solid horizontally across the rafters and nailed with two nails at each bearing; the rafters to be 2'' x 4'' spaced 32'' apart measured from center to center.

*The only testimony which tended to indicate negligence in the specification of the materials was that of Guy L. Rosebrook.** He testified that he was and had been a licensed architect for 25 years, engaged in drawing plans and specifications for 35 years. He had done buildings of every kind; about $150,000,000 worth in the last 10 years; his practice was all over the United States, including Alameda County; he happened to live in Alameda County and had an office in Oakland. He had been at the county fairgrounds; had been through this building but did not pay any attention to its construction. He was familiar with the custom and practice of good building in the county of Alameda. He was shown photographs of the pavilion (Exhibits 1, 2, 4 and 5; Exhibits 4 and 5 portrayed the rafters and the sheathing from the inside of the building looking upward). He was not shown the plans and specifications.

---

*Several of plaintiff's witnesses testified that they had observed the sheathing in place on this roof and that some of it was of lower grade than select merchantable. Such testimony did not indicate that the material specified was inferior, defective, dangerous, or that its use was not in accord with good practice.

In response to the hypothetical question "If you are determining custom and good practice in building, if I told you there was a 32 inch span between the rafters of 1 by 6 inches —1 inch by 6 inch sheathing, would that be good building practice in the County of Alameda?" (Objected to as not a correct statement of the facts in evidence), he said "If I understand your question correctly, the rafters are spaced 32 inches on centers and the 1 x 6 is 30 inches—no, it is not good practice. I have never seen it done in the 35 years of my business."

Defendants claim that this question and answer amounted to the expression of an opinion that it is not good practice to lay 1″ x 6″ sheathing (across a 30″ span) with the sheathing boards 30″ apart instead of being laid solid, edge to edge. Such an interpretation is literally possible but the questions and answers which followed convince us that the witness' opinion was predicated upon sheathing laid solid, edge to edge, across the rafters, and that the jury and the trial judge so understood him.

We observe that this hypothetical question failed to include, as an element, the type or grade of the lumber (Douglas Fir, select merchantable) which the specifications called for. That left open the possibility that Rosebrook had in mind roofing boards of a tensile strength much lower than specified. However, later on he said that examination of the plans and specifications would be of no help to him in determining the safety of 25/32″ x 5-5/8″ sheathing with a 30-inch span; that he based his opinion upon sheathing of those dimensions with that span between the rafters. In effect he said that, under those circumstances, lumber of the highest tensile strength would be unsafe.

Rosebrook further testified that he would not consider that such construction would provide a safe place for roofers to walk upon. He would consider it dangerous. He would consider it safe if one used 2″ sheathing instead of 1″. He had never seen a 32″ span on a house; 24″ is common, usual practice. The F.H.A. will not permit any further spanning on any house. The 24″ span is not limited to homes; it applies to any roof; 24″ is the customary spacing for rafters. He would not know if there were any other buildings in Alameda County that had a 32″ span. There might be such.

His attention was directed to the fact that the county building ordinance permitted 2″ x 4″ rafters to be spaced 12, 16, 24, or 32 inches apart. He asked what kind of sheath-

ing did the ordinance specify for those several spacings, but did not receive an answer. In his opinion, for a 30-inch span, 2″ sheathing instead of 1″ would be safe. He apparently had no basis for his opinion as to safety except what he termed "customary practice." Asked how he would go about determining the type of material which could be employed when the rafters are placed on 32″ centers, he replied, "In the first place, that isn't customary practice" and "I would have no reason to figure it because we just don't do it."

The legal significance of Rosebrook's testimony can best be determined if first we review the pertinent testimony of the other expert witnesses in the case.

*Defendant Hass testified* that he was an architect licensed by the state and had been such ever since 1922. He started the practice of architecture "on his own" in 1925 and had been practicing architecture continuously since then in Oakland, Alameda, Berkeley, and San Francisco.

In February, 1948, he was employed by the county of Alameda to prepare and did prepare a set of plans and specifications for this hog and sheep shelter or pavilion to be erected on the Alameda County Fair Grounds at Pleasanton. During that period rules and regulations concerning the construction of such a building were in effect, the Uniform Building Code of 1946, adopted as a county building ordinance by the county of Alameda. It is used throughout the county; it is the standard of the county and is applied in Alameda County.

The county building ordinance was not put in evidence. Portions of it were read in. Section 2211 provided in part: "Wherever a composition roofing is used, the roof construction shall be solidly sheathed with wood, sheathing to be not less than twenty-five thirty-seconds of an inch thick, or with plywood not less than that set forth in Table No. 31-B."

Section 2305 of the ordinance read as follows: "Roofs shall be designed for a vertical live load of 20 pounds per square foot of horizontal projection applied to any and all slopes, except as hereinafter provided.

"Where the rise exceeds 12 inches per foot no vertical live loads need be assumed, but the roof shall be designed for the dead load and for a wind load of 15 pounds per square foot of vertical projection."

Under section 3203, Table 32-A showed the permissible spac-

ing of rafters, with reference to 1″ sheathing. For a 2″ x 4″ rafter, it permitted 32″ center spacing. That was a maximum spacing.

Table 25-A of the ordinance at first specified 1,200 pounds per square inch as the maximum fibre stress for Douglas Fir; later, 1,450 pounds.

Hass took into consideration these provisions of the ordinance, and the stresses the material would be subjected to, in determining the type and spacing of the sheathing, so as to specify timber sufficient and in compliance with the law for the purpose for which intended, having in mind that workmen would go on this roof to apply a tar and gravel surface. Using select merchantable Douglas Fir 1″ x 6″ with a span of 32″, he determined the stress was approximately 249 pounds per square inch. He stated that the county ordinance permitted a maximum fibre stress of 1,200 pounds to the square inch for such material under such circumstances. When he started his work on this job he used 1,200 pounds as the permissible stress and then changed to 1,450, learning of the change in that regard in the Uniform Building Code. He testified that upon either basis (a permissible stress of 1,200 or of 1,450 pounds) he came out away under the permissible stress. Plaintiff examined Hass concerning formulas used in computing such stresses. Apparently he used the formula $WL/8$ to determine the bending moment, based upon a uniform load. He said that for a concentrated load the formula would be $WL/4$, which if he had used it would have doubled the stress; that a concentrated load is one that is permanently suspended from a given point. He did not consider $WL/4$ applicable here. No evidence controverting or tending to disallow the soundness or accuracy of Hass' computations has been brought to our attention, nor have we discovered any.

Hass said that this type of construction has been employed by others than himself; that it is used and accepted in Alameda County; and is the type that would be ordinarily used for a roof over a sheep and hog shelter.

*John F. Tulloch testified* that he had been engaged in business in Alameda County for the last 30 years. He held a state license as a B-1 building contractor and a license as an engineering contractor. He was engaged primarily in the construction of factories, warehouses and various types of industrial and engineering construction. He examined the plans and specifications here involved and expressed the opinion that a building of the type therein described and built ac-

cording to those specifications, with 1″ x 6″ select merchantable sheathing nailed with two nails at each bearing, would present no hazard; that it is standard practice; that 1″ x 6″ select merchantable sheathing nailed with two nails at each bearing, with a net span of 30″, is entirely safe and is prescribed and permitted by practically all building codes in operation; that in expressing this opinion he had in mind the fact that roofers would be going on this sheathing to install tar and gravel. As reasons for his opinion, he stated that the conditions described meet the requirements of the Uniform Building Code, 1946 edition (referring particularly to section 2211 and to Table 32-A of the code) ; that most of the commercial buildings of this type in this area usually have a roof-rafter spread of 24″, center to center, using the roof as a diaphragm, putting the sheathing on diagonally at an angle of 45 degrees, resulting in a greater span than here, a span of 31 and a fraction inches, somewhat weaker than when the span is 30″. Up to the time of the Long Beach earthquake of 1933 nearly all sheathing where applicable was laid on roof rafters spaced at 32″ on centers. At that time the Building Conference Code officials revamped the Building Code to provide (where necessary to use the roof as a diaphragm for the support of the building; not every roof is so used) for diagonal sheathing on rafters spaced at 24″ so that the roof would act as a "diaphragm to transfer lateral forces produced by earthquakes or cyclones, or something else pushes these forces out to the walls of the column so that they can be transferred back to the ground." The state was in on the consultation which resulted in this change. This code was enacted into a law in Alameda County by ordinance.

Asked upon cross-examination in respect to 1″ x 6″ select merchantable sheathing with a 30″ span, what weight the center of such a board would carry in pounds, Tulloch said he could not answer, not being an engineer. Asked if he knew whether it would carry a 160-pound man with 80 pounds of tar, he said, "Well, in answer to that question—that happens millions of times on the West Coast every year with the same types of roofs." He had laid 1″ x 6″ sheathing at right angles to rafters spaced at 32″, never diagonally; had laid sheathing diagonally only when the rafters were spaced at 24″. Asked concerning the formulas $WL/4$ and $WL/8$, Tulloch said that $WL/4$ is used in computing stress where you have a concentrated load.

*Robert James Fisher, a licensed civil engineer qualified to use the title "structural engineer,"* who had worked as a structural engineer since 1919, operating under his own name since 1936, principally in the San Francisco Bay area, *testified substantially to the same effect as did Tulloch.* He examined the plans and specifications here involved and testified that the sheathing specified is the best grade obtainable on the market; that in carrying out this type of construction there would be presented no condition which would be hazardous or dangerous, he had done many jobs with spacing equal to or greater than this. He had made calculations and found the stress on the sheathing here specified to be 254 pounds per square inch, which is between one-fourth and one-fifth of the 1,200 pounds which this building code allows for Douglas Fir lumber. For a movable or impact load, there is a factor of safety of six, given by the Western Lumbermen's Association. That is, where the allowable stress is 1,200 pounds per square inch you can multiply it by 6, giving an allowable stress of 7,200 pounds per square inch for a movable or impact load. He described a concentrated load as a load concentrated on a spot for an indefinite period, a long term period. The formula for a concentrated load, WL/4, would give stresses double what they would be for a movable or impact load, such as a man walking across the roof, for which the computation formula is WL/8. He said a different formula would be used for the type of impact load such as a railroad car going over a bridge or a moving crane in a warehouse, where there is a continuous flow of movement, but one does not figure that in a building. He found nothing hazardous in the type of construction here specified, bearing in mind the movements back and forth of a man weighing about 160 pounds, carrying two tar buckets, neither of which would exceed 50 pounds in weight. For a five-minute load it would carry up to 1,848 pounds. He based his opinion upon the stresses he found in this material, coming to only 254 pounds per square inch, with the allowable safety factor of six. Based upon his knowledge and experience, he found that this type of construction, the material specified, the length of the span, the thickness of the sheathing, and the various factors he had testified to, were in accordance with normal accepted standards of construction for this type of work.

*Joseph Francis Ward, a registered and acting architect* for 28 years in the San Francisco Bay area and Alameda County, examined the plans and specifications here involved

and testified that they call for construction in accordance with the accepted custom and practice in Alameda County, construction which would not in any way be hazardous, bearing in mind that workmen such as roofers would be employed to go on this roof to apply tar and gravel. He based his opinion on general experience and on recognized and accepted formulas employed by persons in his profession for determining factors of safety. He explained how he arrived at that conclusion. Among the significant factors, he observed that there are different stresses for different types and grades of lumber. He said that laying this sheathing at right angles to rafters spaced 32″ apart on centers would be stronger than laying it at a 45° angle on rafters spaced 24″ apart.

We conclude that Rosebrook's testimony was too insubstantial and incomplete to support an implied finding that Hass negligently specified sheathing material that was of insufficient strength. He admitted that in formulating his opinion he made no computation of the strength of the material he had in mind, or the stresses it would bear. He declined the opportunity to indicate how he would go about making such a computation, retreating with the statement that "it isn't customary practice" to put 1″ sheathing on rafters spaced 30″ apart. "I would have no reason to figure it because we just don't do it." This retreat he made after being confronted with a provision of the ordinance which sanctioned 32″ spacing on centers, a provision with which he apparently was not familiar. The ordinance did not sanction 32″ spacing under all circumstances and conditions. It was necessary for an architect to determine and compute the various kinds and amounts of loads a particular roof would be called upon to carry and to select and specify a type and grade of lumber of sufficient strength to bear those loads with a margin of safety. It was also the customary practice in this community for architects to make such computations and determinations. Such is the testimony of all the other experts in the case. That evidence is not in any substantial degree gainsaid by Rosebrook's statement "I would have no reason to figure it because we just don't do it," upon which his opinion finally rested. That opinion would seem to have no greater weight than if made by a carpenter untrained and inexperienced in computing and determining loads and stresses and the relative tensile strength of various types and grades of lumber. Such an opinion, also, does not take into account the practice of laying 1″ x 6″ sheathing diagonally across

rafters spaced at 24″ when a roof is used as a brace against the forces produced by earthquake shocks; nor does it contradict the testimony of other experts in the case concerning that practice and the fact that in such a case the span of the sheathing slightly exceeds the 30″ span here specified. ▮ It has been said that it is "a general rule that an opinion is worth no more than the reasons upon which it is based" (*Long Beach City H. S. Dist.* v. *Stewart,* 30 Cal.2d 763, 773 [185 P.2d 585, 173 A.L.R. 249]), a rule which seems applicable here.

▮ Mere deviation from "customary practice" does not, under the circumstances of our case, prove that the resulting condition was dangerous or defective. In *Valentine* v. *Hayes,* 67 Cal.App. 650 [228 P. 57], upon a denial of a petition for rehearing, the court held that evidence that a certain ladder was not maintained "in the usual and customary manner and place" did not necessarily show negligence or that the place of employment was unsafe. The court said, "the mere fact that the usual custom has been departed from does not, in itself, prove that the place of employment was unsafe if the facts are without dispute that the system actually used was in fact reasonably safe. . . ." (Pp. 653-654.) ▮ In our case, the mere fact that the use of 1″ x 6″ boards across a 30″ span was not "customary practice," according to Rosebrook, does not in itself prove a dangerous or defective condition in the face of the otherwise uncontradicted evidence that such use of such boards was reasonably safe.

▮ Thus we have here a picture of an architect who carefully computed the loads the sheathing would be called upon to bear and the strength and allowable stress of various materials. He then specified a material which those computations convinced him had a wide margin of safety between the stresses it would receive and those it was capable of bearing. These computations he made in compliance with the applicable requirements of the building laws and in accordance with the standards of good practice in his profession and his community. That, we think, would negative a basis for a finding of negligence even if he had made some mistakes in his computations and there is no evidence that he made any such mistakes; instead, the experts who did compute confirmed his method of computing and the results of his computations.

It becomes unnecessary to consider defendants' contention that Hass' compliance with the requirements of the building laws precluded the legal possibility of negligence, including

the question whether those were maximum or minimum requirements.

The reasoning which leads to the conclusion that there was insufficient evidence to support a finding that the architect was negligent in preparing the plans and specifications leads inevitably to the same conclusion concerning the asserted negligence of the county board of supervisors in approving those plans and specifications.

*Concerning the liability of the county, there is an additional factor to consider.* The case was tried upon the theory that the county might be liable if sheathing of insufficient strength was actually used in the construction of the roof, whether of the type and grade specified or of a lower type or grade than specified in the plans and specifications.

The jury was instructed* that plaintiff's cause of action, if any he had, must meet the requirements of the Public Liability Act (Stats. 1923, ch. 328, p. 675, § 2; 2 Deering's Gen. Laws, Act 5619), which was read to the jury and its requirements explained. As to the element of notice to the county of a dangerous or defective condition, if any, the jury was informed that "the duty on a county to repair or remove a dangerous or defective condition in or on public property does not originate until the person or persons having authority to remedy the condition receive notice thereof. Actual notice consists of express information of the fact. But when a person does not receive such express information, if he does have actual notice of other circumstances sufficient to put a prudent man on inquiry as to the particular fact, and if by prosecuting such inquiry he would learn of such fact, he has constructive notice of the fact itself. The legal effect of that constructive notice is the same as if he had actual notice," and that if "an inherently dangerous or defective condition was created through the carrying out of a plan adopted and authorized by the governing body of the defendant county, no further proof than proof of that fact is needed to charge the county with notice of that condition."

The statute imposes liability upon a county "for injuries to persons . . . resulting from the dangerous or defective condition of public . . . buildings . . . in all cases where the governing or managing board of such county . . . or other

---

*The record shows that the parties stipulated that the court might instruct the jury orally. It does not show the source of any of the instructions; i.e., whether given on the court's own motion or at the request of a party.

board, officer or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of such . . . building and failed or neglected, for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or . . . to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition." (2 Deering's Gen. Laws, Act 5619, § 2.)

█ Our examination of the record indicates that the evidence and the reasonable inferences which may be drawn therefrom are sufficient to support implied findings that sheathing of a lower grade than specified was used in the construction of the roof, that such use of such sheathing resulted in a dangerous or defective condition which was a proximate cause of plaintiff's injury, that architect Hass was the person having authority to remedy such condition, that he had notice of such condition and for a reasonable time after receiving such notice failed and neglected to remedy the condition.

█ The very fact of plaintiff's breaking through the roof, in the circumstances under which it occurred, was evidence of a dangerous or defective condition. His two assistants had taken rolls of felt onto the roof; his practice was to spread them over the roof so they would be where he was going to use them. He was engaged in carrying buckets of hot asphalt along the ridge to the place where it was being applied. Along the way he encountered a roll. He had a few extra rolls because a job might run over. He took two steps aside to avoid the roll and on the second step his left foot broke through a sheathing board and he fell through up to his thigh. When he was extricated he looked down and saw a broken board. It was splintered and jagged and he thought he saw a knot there.

█ Three qualified graders of lumber testified that the sheathing on this roof was of inferior quality. Thomas Jacobsen classified some of it as grade 2 or better, with a sprinkling of grade 3. He inspected all the boards there as he walked through the building. In grading lumber, he said the elements considered are the size of knots, the size of pitch pockets, the grain of the board, the coarseness of the grain. Allen McAllister observed some sheathing of grade 4, some of grade 3, and some of grade 2; the larger the number, the lower the grade; the size of knots and other objectionable qualities are less in a higher grade lumber; select or clear is the highest

grade, it would have the smallest and the least number of knots. He observed in this roof several boards that had large knots, pitch pockets and splits. In select merchantable there can be hardly any knots; if any, they must be small (from one-half inch to smaller) and solid. Splits could occur after the sheathing was in place for a period of time, in lumber of a poor grade. He observed knots as large as 3″ and a branch knot as large as the width of the board. Select merchantable is the highest grade. No. 1 comes next. Abelino Bueno examined the sheathing in place and found select merchantable, No. 1, No. 2, No. 3, and one or two pieces of No. 4. Some had splits. Some had large knots; the largest 3½″. He said weather conditions could cause splits in lumber that had a lot of pitch in it; the sun would open it up.

There is evidence that Hass was a ''person having authority to remedy such a condition'' on behalf of the county. A contract dated February 24, 1948, executed by and between the county and Hass, in addition to committing to him the preparation of the plans and specifications for this building, made it his power, duty, responsibility and jurisdiction to define the meaning of the drawings and specifications, such interpretations and definitions to be final; to direct and supervise the erection and completion of the construction work to the end that such work be completed in strict conformity with the drawings and specifications and in a good and workmanlike manner; to order the correction or removal of all defective work and materials and all work and materials not strictly conforming to the plans and specifications; to see that said work be constructed and completed in strict accordance with the plans and specifications adopted therefor; to make such inspections as were necessary to enable him to properly advise the county.

It is significant that this was a contract between Hass and the county which made Hass the responsible agent or representative of the county, with these important powers, duties and responsibilities to exercise on behalf of the county. This expression of these functions of Hass was implemented by the following statements which appeared in the specifications: ''All questions in regard to the interpretation of the scope or meaning of the plans or specifications and the adjustment of discrepancies within or between the plans and specifications shall be referred to the Architect of the Board [of Supervisors] and his decision thereon shall be final. The Board will be represented by its Architect, who shall have general super-

vision of the performance of the work in strict accordance with the plans and specifications of the contract or contracts of which these specifications form a part. In order that the Board may act upon expert advice, and upon good procedure, all communications from the contractor to the Board will be through the Architect, and all communications and instructions from the Board to the contractor will be through the Architect. The Board reserves the right to alter this procedure without the consent of the contractor.''

Hass testified that he assumed general supervision of the work in accordance with these specifications and made inspections from time to time while this building was being constructed. In the course of his inspections he noticed some deviations and instructed the general contractor's foreman thereof; deviations on all parts of the job, wherever he ran into any. He made inspections of the roof of this building, during the early part of its construction. He observed deviations in the sheathing for the roof. They related to the grade of sheathing. He made this inspection while the sheathing was on the ground before any work was done on the roof. He told the foreman that these deviations would not be accepted and that the lumber would have to be regraded or other sheathing obtained. He saw the roof being started. By the time of his next visit the roof had been completed, the tar and gravel was on it. Shown a picture which portrayed the underside of the sheathing in place on the roof, he said that sheathing did not look like the sheathing he saw going into the roof. He said that a 1½″ knot would be the largest permissible in 1″ x 6″ select merchantable lumber and that a loose knot would not be allowable.

The jury could reasonably have found that the discovery of inferior lumber on the ground, destined for the roof, would "put a prudent man on inquiry," and that Hass was therefore negligent in not making another inspection until after this sheathing was in place, covered with the tar and gravel. In respect to what constituted a "reasonable time" after notice, within which to remedy a condition, the jury, told to "consider all the circumstances involved and shown by the evidence," well may have considered inspection prior to the tar and gravel work reasonably necessary under the circumstances. Among "these circumstances" was the very fact that this roof was being constructed, the sheathing would soon be laid and workmen would have to walk back and forth across the sheathing to surface it with tar and gravel. Hass had

the duty of inspection commensurate with the job at hand.
There is no occasion here to apply the rule that a dangerous or defective condition must be conspicuous or notorious for a public agency such as a county to be liable in the absence of actual notice. That rule is appropriate when the wear and tear of the ordinary use of a sidewalk develops a dangerous or defective condition. It does not apply as a matter of law to a building in course of construction under the circumstances shown by the evidence in this case.

The county in support of the claim that it had neither knowledge nor notice of any dangerous or defective condition, argues that the board of supervisors employed one Carlton Fletcher, as an inspector of construction on this job, that Fletcher was unacquainted with the grades of lumber or with the details of structural design and did not discover any dangerous or defective condition prior to the accident; indeed, may not have gone on the roof until after the accident.* We do not deem this point well taken. The evidence fails to indicate that Fletcher was a building inspector in the usual sense of that term, with power to reject substandard materials and disapprove or remedy improper methods of construction. Instead, he appears to have functioned as an administrative assistant to the manager of the county fair, reporting to him "in a general way" the progress of work on various buildings under construction. The manager was interested in seeing that the buildings were completed in time for the county fair, which was soon to commence. We find no evidence that the appointment of Fletcher or the functions given him superseded or diminished in the slightest degree any of the powers, duties, authority or jurisdiction vested in Hass by the contract of February, 1948, between Hass and the county.**

(2) *Was the failure of the general contractor to comply with the specifications as to the grade of lumber a supervening act which broke the causal connection?* This point is presented by the California Council of Architects as amicus curiae, not by any of the parties upon this appeal.

*Such an argument might tend to indicate that the board negligently chose an incompetent inspector and thereby violated the "rules governing such constructive notice" which "require reasonable diligence in making inspections for the discovery of unsafe or defective conditions." (*Perry* v. *City of San Diego*, 80 Cal.App.2d 166, 170 [181 P.2d 98].)

**While it may seem anomalous to hold the principal (the county) and not the agent (Hass) liable, the reason is that the cause of action against Hass was narrowly limited to alleged "specification" of inferior material, but was not thus limited as against the county.

The negligence of the county through its board, officer or person having authority to remedy the dangerous or defective condition need not be the sole proximate cause of the injury. Nor has our attention been directed to any evidence showing that the county was not responsible for the condition of this building; i.e., no showing that at the time of the accident the county did not, in respect to this building, owe plaintiff the duties defined and imposed by the Public Liability Act. Accordingly, the liability, if any, of the general contractor (not a party to this action) has no bearing upon the issues here involved.

(3) *Did plaintiff fail to exercise due care for his own safety?*

The county claims that as a roofer of 14 years' experience plaintiff must have been acquainted with the hazards attendant upon that kind of work; hence, he assumed those risks. ▓▓▓ But a defective roofing board was not necessarily, as a matter of law, such a hazard. ▓▓▓ Asked if it were not customary, before applying roofing materials, to go up on a roof and check to see if there were knotholes, the plaintiff said, "We don't do that. The person who builds the building usually does that." On this occasion he asked for the carpenter foreman to see if the building was ready and the foreman told him it was ready to be roofed. That evidence tends to support the implied finding that plaintiff did not assume the particular risk here involved. It does not furnish a basis for a reviewing court to hold, as a matter of law, that the county sustained its burden of proving that plaintiff assumed the risk.

The county further claims that plaintiff contributed to his injury by not wearing gloves and by wearing a short-sleeved instead of a long-sleeved shirt.* Counsel for the county asked the plaintiff: "Mr. Paxton, you are familiar with the Industrial Accident Commission rule that says that all roofers working on kettles or carrying buckets of hot tar should at all times wear gloves, also full length sleeves fastened at the wrist, and at no time should any roofer work without a shirt——" Plaintiff replied: "The men on top don't usually do that. The man who runs the kettle has to have a long shirt on. The men working on top of the roof, we never practice that." It was his understanding that the regulation applied to the man at the kettle, not to the men carrying buckets on the roof.

---

*That, of course, would have no bearing upon the cause of the accident, a defective board which gave way.

It would appear that counsel was reading from an advisory, not a mandatory, portion of a state safety order (8 Cal. Adm. Code 1686). That section, in mandatory terms, prescribes certain requirements in respect to "roofing buckets and operations." For example, it says that tar buckets "shall" be made of certain materials; carrying buckets "shall" be of the same construction and not over a certain size; and that the carrying of buckets of hot tar up ladders is "prohibited." It then tenders this suggestion: "*Advisory*: Roofers working on kettles or carrying buckets of hot tar *should* at all times wear gloves, also full length sleeves fastened at the wrist, and at no time *should* any roofer work without a shirt." (Emphasis added.) The "advisory" portion, clearly, is not a mandate upon which to predicate negligence as a matter of law, when the advice is not followed. Nor does it appear that plaintiff's understanding that this advice did not apply to him at the time was other than bona fide. There is nothing here to take the issue of contributory negligence out of the realm of fact, for determination as a matter of law.

(4) *Were the damages awarded excessive in amount?* This is a point urged by the architects, not by the county. It is not necessary to decide the question in view of our determination that the architects are not liable under the issues presented by the complaint. However, we have examined the evidence as to the nature and extent of plaintiff's injuries and do not perceive a basis for holding the award excessive.

(5) *Did the court commit prejudicial error during the course of the trial?*

(a) The architects claim it was error to permit the county to interrogate Hass, when on the witness stand, regarding his contract of February, 1948, with the county. Our conclusion that the architects are not liable makes it unnecessary to decide this issue. This disposition of the question carries no inference that we deem the allowance of those questions in any way erroneous.

(b) *Did the trial court refuse to permit inquiry concerning plaintiff's second injury, and, if it did, was such refusal prejudically erroneous?*

At the trial, which commenced September 7, 1951, plaintiff wore casts upon his arms. In response to questions asked by counsel for the county, he testified that these casts had nothing to do with the injuries received on the roof; it was another accident which happened "about ten weeks ago," on a construction job. To the next question, "For whom were you

working at the time," an objection was made and sustained. The cross-examiner, without giving any indication of why he thought that question material, proceeded with this line of inquiry and brought out the facts that the second injury was not a burn, had nothing to do with tar; the skin was not cut, bruised or torn; both wrists were broken; plaintiff was working for the Fidelity Roofing Company. The cross-examiner then dropped this line of inquiry without comment and went into other phases of the case with the witness.

The county suffered no curtailment here. Indeed, it got the answer to the very question to which, when first asked, an objection was made and sustained. It successfully pursued this line of inquiry as far as it desired at the trial. There is no merit in this point.

(c) *Did the trial court commit prejudicial error by instructing the jury concerning loss of time and impairment of earning power in the future?*

█ The county contends it was error to give instructions on this subject because, as it claims, there was no evidentiary basis therefor. The county is in no position to complain. It has furnished a record which does not disclose the source of any of the instructions, whether given at the request of the plaintiff or one or all of the defendants, or upon the court's own motion. (See *Sutter Butte Canal Co.* v. *American R. & A. Co.*, 182 Cal. 549, 554 [189 P. 277]; *Buckley* v. *Shell Chemical Co.*, 32 Cal.App.2d 209, 216-217 [89 P.2d 453]; *Leenders* v. *California Hawaiian etc. Corp.*, 59 Cal.App.2d 752, 759 [139 P.2d 987].)

The asserted lack of evidence is based upon the absence of medical testimony concerning plaintiff's physical condition and the fact that the plaintiff had resumed work and was receiving the same rate of pay as at the time of the accident.

█ It was "not necessary to produce an expert witness on the subject of . . . future earning ability." (*Castro* v. *Giacomazzi Bros.*, 92 Cal.App.2d 39, 46 [206 P.2d 688].)

█ Although plaintiff had resumed work at the same rate of pay as before, he was working for a different employer, a friend of his who was giving him a lighter type of work, one which did not involve the carrying of heavy buckets of tar; also, that his left arm is smaller now and doesn't have the strength in it; that his elbow and wrist continue to bother him and that he cannot grasp things with his left arm, not having the strength in his fingers and wrist and elbow that he had prior to the accident. Here was sufficient evidence to go to

the jury under the instruction complained of. (*Parsell* v. *San Diego Consol. G. & E. Co.*, 46 Cal.App.2d 212, 216 [115 P.2d 539]; *Lang* v. *Barry*, 71 Cal.App.2d 121, 126-127 [161 P.2d 949]; *Paolini* v. *City & County of San Francisco*, 72 Cal.App. 2d 579, 591 [164 P.2d 916]. See, also, *Loper* v. *Morrison*, 23 Cal.2d 600, 611 [145 P.2d 1]; *Buswell* v. *City & County of San Francisco*, 89 Cal.App.2d 123, 132 [200 P.2d 115].)

▮▮▮ Moreover, the instructions on this subject were not at all in the nature of a direction to the jury to find and award future damages. For example, the court said: "*if you find* that plaintiff's power to earn money has been impaired by the injuries, such sum as will reasonably compensate him for such loss of future earning power, *if any.*" (Emphasis added.) In addition, the judge advised the jury he was giving instructions embodying such rules of law as might be necessary to assist in arriving at a verdict, and that "as to some of these instructions, their application depends upon the light in which you view the evidence. The fact that the Court gives you instructions as to particular rules of law must not be taken by you as an indication that such rules are necessarily applicable. Where there is a conflict of evidence, the question as to whether a particular rule of law is applicable depends frequently and solely upon the conclusion as to what the facts are, and the jury are the sole judges of the facts." Thus it is clear that the court gave these instructions contingently for use only if the jury should find physical disability and impairment of future earning power. (See *Castro* v. *Giacomazzi Bros., supra,* 92 Cal.App.2d 39, 46; *Anderson* v. *Freis,* 61 Cal.App.2d 159, 166 [142 P.2d 330]; *Parsell* v. *San Diego Consol. G. & E. Co., supra,* 46 Cal.App.2d 212, 216.) We find no error, prejudicial or otherwise, in the giving of the questioned instructions.

That portion of the judgment which awards damages and costs in favor of plaintiff against defendants Kent and Hass, a copartnership, Thomas J. Kent and Andrew T. Hass, is reversed; the remainder of the judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied August 27, 1953, and appellant's (County) petition for a hearing by the Supreme Court was denied September 24, 1953. Schauer, J., was of the opinion that the petition should be granted. Shenk, J., did not participate therein.