MID–WESTERN ELECTRIC, INCORPO-
RATED, a South Dakota Corpora-
tion, Plaintiff and Appellee,

v.

DeWILD GRANT RECKERT &
ASSOCIATES CO., Defendant
and Appellant.

No. 17858.

Supreme Court of South Dakota.

Argued Jan. 11, 1993.

Decided May 19, 1993.

Jon C. Sogn, Lynn, Jackson, Shultz & Lebrun, P.C., Sioux Falls, for plaintiff and appellee.

Steven W. Sanford, Cadwell, Sanford & Deibert, Sioux Falls, for defendant and appellant.

WUEST, Justice.

The engineering firm of DeWild Grant Reckert & Associates (DGR) prepared specifications for and advised the Guard concerning the installation of a fire detection and suppression system to be installed at the Air National Guard's base in Sioux Falls, South Dakota. Mid–Western Electric, Inc. (Mid–Western), the electrical subcontractor for the project, alleged DGR was professionally negligent after the equipment Mid–Western installed was rejected as not conforming to specifications. The jury found DGR liable. DGR claims seven errors which we address seriatim. We reverse.

### FACTS

DGR is a multi-disciplinary engineering and architectural firm with offices in Rock Rapids, Sioux City and Des Moines, Iowa, Denver, Colorado and Sioux Falls, South Dakota. In 1982, the Air National Guard hired DGR to prepare drawings and specifications for fire detection and suppression systems for the Guard's base at Joe Foss Field in Sioux Falls, South Dakota. The plans required input from several engineering specialties. The specifications at issue in this case were originally drafted by Jim Wagner, an electrical engineer with DGR. After Wagner left DGR in 1983, Ted Clavell, a DGR mechanical engineer took over the project. The plans were sent to Schirmer Engineering of Chicago in August of 1983 to review the electrical portion of the specifications; Schirmer made some changes and the plans were returned to DGR. Subsequent changes were made by DGR. Throughout the process, the Air National Guard in Sioux Falls, Maryland and Washington, D.C. reviewed, commented on and made changes in the plans and specifications. The plans were approved and submitted to the Guard as 95% completed. The Guard requested further changes which were made by DGR. After all the changes, the plans and specifications contained discrepancies.

In 1985, funding was obtained, bids solicited and DGR entered into a contract with the Guard to oversee the project. In July, 1985, Terry Prestbo, a licensed electrician and president of Mid–Western, Inc., obtained the plans and specifications for the electrical portion of the project. He received bids from suppliers of electrical equipment, the lowest bid coming from TLC Sales. TLC put in a general bid (without a list of specific equipment) that it would supply all necessary equipment. TLC's bid was much lower (up to half the price) than the bids of other electrical suppliers. Because of the tremendous price spread, Mid–Western contacted TLC twice to question whether the bid was complete and the equipment up to specifications; it was assured the bid was correct. Mid–Western then added its own costs and profit to the TLC offer and submitted its bid to several general contractors for the project. Jans Corporation received the general contract for the project and notified Mid–Western it was the successful bidder for the electrical work.

Mid–Western then checked the background and references of TLC Sales; it received good recommendations. Prestbo traveled to an Air National Guard Base in Kentucky to view the testing of TLC supplied equipment installed at a similar project. In July of 1985, Mid–Western received a list of the equipment TLC had bid. Prestbo did not check the equipment list against the specifications for the project. In September of 1985, Mid–Western signed the contract with Jans to do the electrical work on the project.

The list of equipment TLC provided to Mid–Western was submitted through the Guard to DGR for its review and approval. DGR notified the Guard the plans and specifications called for two radio receiving consoles, one with a printer, in separate buildings—not one radio receiving console in one building with a remote receiving print-

er in another building as per the list supplied by Mid–Western. Mid–Western was required to provide the additional receiving console for the project with no additional compensation.

The plans and specifications also called for installation of ultraviolet (UV) detectors in the airplane hangars. The detectors were required to recognize the energy given off by a fire and then trigger a system that would flood the hangar with four feet of foam to smother any fire before it spread. The specifications called for detectors that could discover a 10′ × 10′ (100 sq. feet) fuel fire at a distance of 150′ within five seconds. Additionally, to detect the energy given off by flame (as distinguished from the energy given off by a source such as sunlight), the detectors were to be "sensitive to radiation in the range of 1,850 to 2,450 angstroms." The alarm panel for the detectors showed two detection zones on the specifications, one zone for each room. The Guard required that contractors submit "catalog cuts" of equipment for prior approval to insure the equipment met specifications. Additionally, equipment deviating from specifications was to be noted on a cover page, a form 3000, submitted along with the catalog cuts.

The catalog cuts of the UV detectors submitted for DGR's approval were to detect flame in a range of 1700 to 2900 angstroms within six seconds. Neither Mid–Western nor TLC noted any deviations from specifications on the cover sheet. The difference in the detectible range was brought to the attention of the Guard by DGR's project manager, Ed Cable, but he assumed the detectors could be adjusted to cover a narrower energy band. Mid–Western was never notified of the discrepancies. The equipment was given approval and the detectors were installed.

Arrangements were made to test the detectors after installation. An Air National Guard Officer was brought in to run the tests. When he saw the detectors before the test, the officer stated they were not what the Guard wanted. Because the hangar was not large enough to test a fire from 150′, the size of the fire was reduced.

The detectors failed to go off within five seconds. After the detectors were repositioned, a larger fire was lighted; eventually the detectors went off in nine seconds.

Mid–Western contacted the manufacturer of the equipment, repositioned the detectors and asked to have them tested again. The Guard informed Mid–Western that should the detectors meet the time requirement, they would be rejected for two additional reasons. First, it claimed the detectors picked up too wide an energy band. Second, although the alarm panel showed which zone a tripped detector was in, it failed to identify which one of the 16 detectors had been tripped.

The Guard then requested a change order specifying the UV detectors be replaced with ultraviolet, infrared detectors (UVIR). The Guard agreed to pay Mid–Western an additional amount for the UVIR detectors but refused to give Mid–Western full credit for the UV detectors that did not meet specifications, although it did give Mid–Western more credit than DGR had recommended.

Mid–Western then sued DGR, Sid Early of TLC, and the Ames Security Corporation, supplier of the UV detectors, for the economic loss it had suffered. Early and Ames were dismissed as defendants by Mid–Western and the case against DGR went to trial. The jury returned a verdict in favor of Mid–Western in the amount of $45,020.

DGR appeals stating seven issues:

I. MID–WESTERN'S CLAIM IN TORT FOR ECONOMIC LOSS CANNOT BE MAINTAINED WHERE MID–WESTERN HAD AN ADEQUATE CONTRACTUAL REMEDY AGAINST THE PARTIES TO ITS CONTRACTS AND WHERE MID–WESTERN WAS NOT A PARTY TO THE DGR CONTRACT WITH THE GUARD.

II. MID–WESTERN OFFERED NO EVIDENCE THAT DGR "OMITTED" TO PERFORM ITS CONTRACT WITH THE GUARD AND MID–WESTERN'S EVIDENCE

WAS OTHERWISE INSUFFICIENT TO SUPPORT THE VERDICT.

III. THE TRIAL COURT ERRED IN REFUSING TO GIVE DGR'S REQUESTED INSTRUCTION ON CONTRIBUTORY NEGLIGENCE.

IV. THE TRIAL COURT ERRED IN GIVING INSTRUCTIONS NOS. 8 AND 20 AND IN REFUSING TO GIVE DGR'S PROPOSED INSTRUCTIONS NOS. 2, 4 AND 102–105 REGARDING BURDEN OF PROOF, ISSUES TO BE DECIDED BY THE JURY AND THE LIABILITY THEORIES AGAINST DGR.

V. THE EVIDENCE CONCERNING LAPSE OF ED CABLE'S SOUTH DAKOTA ARCHITECTURAL LICENSE CONSTITUTED SURPRISE UNDER SDCL 15–6–59(a)(3).

VI. THE TRIAL COURT ERRONEOUSLY FAILED TO GRANT DGR'S MOTION IN LIMINE CONCERNING EVIDENCE OF DAMAGES ATTRIBUTABLE TO MID–WESTERN'S LOSS OF BONDING CAPACITY AND FURTHER FAILED TO GRANT DGR'S MOTION FOR A CONTINUANCE.

VII. THE COURT ERRED IN GIVING INSTRUCTIONS 14, 14A AND 14B REGARDING LICENSURE AND CERTIFICATION OF PLANS AND SPECIFICATIONS AND FAILED TO GIVE DGR'S REQUESTED INSTRUCTION 101 WHICH SOUGHT TO AMELIORATE CABLE'S LACK OF A SOUTH DAKOTA LICENSE.

### I. & II.

■ DGR asserts it owed no duty to Mid–Western due to lack of privity of contract. This assertion is based on the traditional tort rule that privity of contract is required to show a duty. Without breach of a duty owed to Mid–Western, DGR would not be liable for any damages Mid–Western incurred. It is conceded by both parties there is no contractual privity between them. Therefore this cause of action rests on a claim of professional negligence which damages a foreseeable third party.

The strict requirements of privity of contract to maintain an action for damages began to blur in the landmark case of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916). "We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else." *MacPherson,* 217 N.Y. 382, 111 N.E. at 1053. The early negligence cases were founded on recovery for physical injury. *See Paxton v. Alameda County,* 119 Cal.App.2d 393, 259 P.2d 934 (1953); *Inman v. Binghamton Housing Auth.,* 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895 (1957). The trend broadened and under Missouri law an action was allowed claiming economic damages where an owner sued the contractor's surety for cost overruns on a project. *Hall v. Union Indemnity,* 61 F.2d 85 (8th Cir.1932) *cert. denied* 287 U.S. 663, 53 S.Ct. 222, 77 L.Ed. 572 (1932) (cause of action recognized but negligence of non-party architect was imputed to the owner so contributory negligence defeated claim).

Today the majority of jurisdictions that have examined this question allow a cause of action against an architect or engineer for economic damage if a party was foreseeably harmed by the professional's negligence. *Donnelly Construction Co. v. Oberg/Hunt/Gilleland,* 139 Ariz. 184, 677 P.2d 1292 (1984) (design professional may be liable to foreseeable plaintiff-contractor for increased cost of construction due to error in plans and specifications); *A.R. Moyer, Inc. v. Graham,* 285 So.2d 397 (Fla. 1973) (architect/engineer may be liable on negligence theory absent contractual privity); *Audlane Lumber & Builders Supply v. D.E. Britt Assoc., Inc.,* 168 So.2d 333 (Fla.Dist.Ct.App.1964) (architect liable on negligence theory to a third party as a result of faulty plans and specifications); *Evans v. Howard R. Green Co.,* 231

N.W.2d 907 (Ia.1975); *Bacco Construction Co. v. American Colloid Co.,* 384 N.W.2d 427 (Mich.App.1986) (foreseeable that contractor would rely on a project engineer's report in performing project); *Prichard Brothers, Inc. v. Grady Co.,* 428 N.W.2d 391 (Minn.1988); *Waldor Pump & Equipment Co. v. Orr–Schelen–Mayeron & Assoc.,* 386 N.W.2d 375 (Minn.Ct.App.1986) (engineering firm could be sued for negligent drafting and interpretation of plans where subcontractors economically damaged); *Westerhold v. Carroll,* 419 S.W.2d 73 (Mo.1967); *Conforti & Eisele v. John C. Morris Assoc.,* 175 N.J.Super. 341, 418 A.2d 1290 (1980) *aff'd* 489 A.2d 1233 (N.J.Super 1985) (lack of contractual privity does not bar tort action against engineers and architects for negligent design); *A.E. Investment Corp. v. Link Builders, Inc.,* 62 Wis.2d 479, 214 N.W.2d 764 (1974).

Although we have never before considered a claim based on this cause of action, this court has recognized a professional architect may be held responsible if a third party is physically injured due to his negligence. *Duncan v. Pennington County Housing Auth.,* 283 N.W.2d 546 (S.D.1979). The cause of action for economic damage based on professional negligence should not be confused with our holding in *Karras. Time Out, Inc. v. Karras,* 469 N.W.2d 380, 386 (S.D.1991) (Subsequent tenant does not have cause of action based on common law property rights or landlord/tenant relationship to recover for intentional damage to real estate by former tenant, his remedy lies within lease agreement).

To deny a plaintiff his day in court would, in effect, be condoning a professional's right to do his or her job negligently with impunity as far as innocent parties who suffer economic loss. We agree the time has come to extend to plaintiffs recovery for economic damage due to professional negligence. We therefore recognize that in South Dakota a cause of action exists for economic damage for professional negligence beyond the strictures of privity of contract.

■ Having recognized the cause of action, we must now set forth the factors a court should use in determining whether a duty exists.

In *Waldor Pump,* the court stated:

We find it foreseeable that [this subcontractor] and other subcontractors, who were bound to follow the specifications prepared by [the engineering firm], could be harmed by [the engineering firm's] negligent drafting or interpretation of the specifications. Therefore, [the engineering firm] owed a duty to [the subcontractor] to reasonably draft and interpret the project's specifications.

*Waldor Pump,* 386 N.W.2d at 377. Similarly, the *Moyer* court focused on the foreseeability of injury when defining the scope of a professional duty; *"The nature of the professional's duty, the standard of care imposed, varies in different circumstances.... In our view the extent of appellee's duty may best be defined by reference to the forseeability [sic] of injury consequent upon breach of that duty."* *Moyer,* 285 So.2d at 400 (quoting *Audlane,* 168 So.2d at 335). We instruct trial courts to use the legal concept of foreseeability to determine whether a duty exists.

### III.

DGR asserts the trial court's failure to instruct the jury on contributory negligence was error. Mid–Western maintains there was no expert testimony establishing contributory negligence; that DGR's proposed instructions were incorrect statements of the law; and, there was insufficient evidence to instruct on contributory negligence.

■ This issue is also one of first impression in this court; we have never ruled whether contributory negligence may be a defense to professional negligence. The overwhelming number of jurisdictions that have considered the question have held that contributory negligence can be a defense in professional negligence cases against physicians, attorneys and accountants. Two cases have allowed contributory negligence as a defense in malpractice actions against architects or engineers. *Bell v. Jones,* 523

A.2d 982 (D.C.1986) (architect was contributorily negligent in failing to inform surveyor report was for architectural or construction use, not title dispute); *Siteman v. Woodward–Clyde & Assoc., Inc.,* 503 S.W.2d 141 (Mo.1973) (landowner who failed to read report in its entirety and failed to obtain help in understanding engineer's report on soil conditions was contributorily negligent). We hold that instructions on contributory negligence should have been given in this case.

Testimony was presented asserting Mid–Western had no knowledge or expertise concerning the equipment required in the contract, failed to review plans and specifications for discrepancies, relied on the assurances of a supplier it had never dealt with before notwithstanding the supplier's price was half that of the other bidders, did not note variances from specifications on the form 3000 as required, and never requested the Guard to clarify the plans and specifications.

■ Expert testimony is needed to establish the standard of care of a professional unless the area is within the common knowledge and comprehension of the ordinary laymen. *Magbuhat v. Kovarik,* 382 N.W.2d 43 (S.D.1986). Unless the issues are unusually complex, expert testimony is not required. *Morin v. Chicago & Northwestern Ry. System,* 87 S.D. 447, 209 N.W.2d 895 (1973). It is within the understanding of the ordinary layman that failure to review plans and specifications or failure to submit a required form noting variance from specifications may fall below a professional standard. We reverse the judgment as the jury was not instructed on contributory negligence.

## IV.

As we recognize a cause of action for professional liability outside of contract, we do not reach the merits of DGR's claim the trial court erred in refusing its requested instructions relating to breach of contract.

## V. & VII.

■ DGR argues the trial court should have granted a new trial on the grounds of "surprise" based on testimony and a letter offered into evidence from a South Dakota licensing authority concerning the unlicensed status of Ed Cable, the project architect for DGR. To establish error, SDCL 19–9–3 [1] requires a finding that a substantial right of a party has been affected and a timely objection to the court's ruling was made. DGR did not object during the trial nor was a motion for continuance made to the trial court. Therefore this issue is waived under *Jacobson v. Hamman,* 45 S.D. 542, 189 N.W. 517 (1922).

■ DGR also claims it was error for the judge to instruct the jury using language from SDCL 36–18–5, South Dakota's law requiring licensing of architects, engineers and surveyors. DGR has not cited any authority and the issue is deemed waived on this appeal. SDCL 15–26A–60(6); *Nielsen v. McCabe,* 442 N.W.2d 477 (S.D.1989). The trial court may want to reconsider its instruction if this issue is briefed and/or argued in a new trial.

## VI.

DGR asserts Mid–Western's claim for additional damages based on loss of bonding capacity was not made known to DGR until the deposition of Terry Prestbo, one week before trial. After the deposition, DGR did not request any additional information concerning the claim from Mid–Western. Immediately before trial, DGR motioned for a continuance based on Mid–Western's failure to supplement its discovery request under SDCL 15–6–26(e). [2]

1. SDCL 19–9–3 provides:

   Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
   (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground

of objection, if the specific ground was not apparent from the context; or
   (2) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

2. SDCL 15–6–26(e) provides:

■ The decision whether to grant a motion for a continuance rests within the discretion of the trial court. 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure:* Civil § 2352 (19__). "[A] continuance may properly be denied when the party had ample time for preparation or the request for a continuance was not made until the last minute[.]" *Id.* While Mid–Western should have supplemented its answers to interrogatories, DGR waited to motion for a continuance the morning of trial, with the jury waiting for the proceedings to start. In such a situation the trial judge was within his discretion to deny the motion.

We reverse.

MILLER, C.J., and HENDERSON and AMUNDSON, JJ., concur.

SABERS, J., concurs specially.

SABERS, Justice (concurring specially).

I agree with the holdings of the majority on all issues. I write specially to take issue with the majority's treatment of the *Karras* holding as follows:

> The cause of action for economic damage based on professional negligence should not be confused with our holding in *Karras. Karras v. Time Out, Inc.,* 469 N.W.2d 380, 386 (S.D.1991) (Subsequent tenant does not have cause of action based on common law property rights or landlord/tenant relationship to recover for intentional damage to real estate by former tenant, his remedy lies within lease agreement).

In my view, the majority would be more forthright to simply admit its error on Issue V in *Karras.* As I urged in *Karras:*

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
> (1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (A) the identity and location of persons having knowledge of discoverable matters, and (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

Alpha claimed that Karras damaged the restaurant before vacating the premises. Alpha proved its case as the jury awarded Alpha compensatory damages and interest. Alpha had a leasehold interest in the restaurant property and that is sufficient to sustain the damage award.

SDCL 20–9–1 provides in part:

> Every person is responsible for injury to the person, *property,* or rights of *another* caused by his willful acts or caused by his want or ordinary care or skill[.] (Emphasis added.)

This statute clearly provides a duty and it would be error for *this* court to determine otherwise. This is not a matter of privity as correctly acknowledged by the trial court but incorrectly concluded by the majority opinion. This is a tort, not a contract matter. "A duty to use proper care may also arise from a contractual relationship and breach of the resulting duty may give rise to tort liability." *Limpert v. Bail,* 447 N.W.2d 48, 51 (S.D. 1989) (citing *Friedhoff v. Engberg,* 82 S.D. 522, 527, 149 N.W.2d 759, 762 (1967)). "Liability in tort for breach of that duty may arise as the result of negligence during the performance of the contract, even if there has been no breach of contract." *Id.* (citing *Layman v. Braunschweigische Maschinenbauanstalt, Inc.,* 343 N.W.2d 334, 341 (N.D. 1983)).

*Karras,* 469 N.W.2d at 387 (Sabers, J., dissenting). Obviously, it is too late to help Alpha against Karras, but it is never too late to help the law.

> (2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (A) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
> (3) A duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new request for supplementation of prior responses.

The majority also overlooks this court's precedent in *Limpert v. Bail,* 447 N.W.2d 48 (S.D.1989), which held that a professional veterinarian's legal duty runs not only to the owner and seller of tested cattle, but also to the buyer. *Id.* at 51. In so holding, we stated:

> Even if the contractual relationship was between Rotenberger [veterinarian] and Limpert [owner and seller], rather than Rotenberger and Bail [buyer], a breach by Rotenberger of the duty owed to Limpert could still render Rotenberger liable to Bail. As explained by the court in *Layman, supra:*
>
>> Where one undertakes by contract to perform a certain service and is chargeable with the duty of performing the work in a reasonably proper and efficient manner, and injury occurs to a blameless person, the injured person has a right of action directly against the offending contractor which is not based on any contractual obligation but rather on the failure of such contractor to exercise due care in the performance of his assumed obligation.
>
> *Id.* at 341 (quoting 57 Am.Jur.2d *Negligence* § 50). Such an imposition of liability is consistent with SDCL 20-9-1, which provides in part: "Every person is responsible for injury to the person, property, or rights of another caused by his ... want of ordinary care or skill[.]" Rotenberger had a duty to exercise due care in the testing of the cattle. If in turn, Rotenberger allowed Limpert to do some of the testing, it would not absolve him from his responsibility to Bail. Thus, a legal duty and genuine issues of material fact exist.

*Limpert,* 447 N.W.2d at 51–52 (citations omitted). Accordingly, a claim based on the cause of action is not entirely new to this court.