Betty Ann ZIMMERMAN, Administratrix of the Estate of Bessie Lee Junes, Deceased, Appellant,

v.

SAFEWAY STORES, INC., Appellee.

Betty Ann ZIMMERMAN, Administratrix of the Estate of Bessie Lee Junes, Deceased, Appellant,

v.

Dr. Leonard J. HANTSOO, Appellee.

Nos. 21556, 21557.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 5, 1968.

Decided March 20, 1969.

---

Mr. Karl G. Feissner, Hyattsville, Md., with whom Messrs. William L. Kaplan and Thomas P. Smith, Hyattsville, Md., were on the brief, for appellant.

Mr. Frank F. Roberson, Washington, D. C., with whom Mr. James A. Hourihan, Washington, D. C., was on the brief, for appellee in No. 21,556.

Mr. John L. Ridge, Jr., Washington, D. C., with whom Mr. J. Harry Welch, Washington, D. C., was on the brief, for appellee in No. 21,557.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

McGOWAN, Circuit Judge:

These consolidated appeals are from judgments in the District Court granting motions for directed verdicts at the close of all the evidence. Appellant is the administratrix of the estate of one Mrs. Junes. The complaint against appellee Safeway Stores, Inc., charges that Mrs. Junes's death on July 24, 1963, was attributable to an injury negligently inflicted upon her in appellee's store on the preceding July 1. Damages are sought both for wrongful death and for losses sustained in the period between injury and death. The complaint against appellee Hantsoo charges him with medical malpractice in the treatment of Mrs. Junes's injury leading to her death, and seeks damages solely for wrongful death. Appellant's principal contention here is that the state of the evidence was such as to entitle her to consideration of her claims by the jury. We agree.

I

The fact was undisputed that Mrs. Junes had suffered an injury while shopping in a Safeway store on July 1, 1963. This injury was in the form of a gashing of her arm by a sharp piece of metal which had become unattached in the shopping cart, provided by Safeway, which Mrs. Junes was using. Although there is some disagreement as to the seriousness of her injury, Safeway did not challenge either its existence or its cause. Safeway's evidence was primarily directed to showing that its carts are cleaned once a month, at which time they are incidentally inspected for damage; and that the last such inspection had occurred two weeks prior to the accident. The manager of the store in question testified that, in his nineteen years of working for Safeway, he had seen similar defects in the store's carts on only two or three occasions.

The evidence was that appellee Hantsoo was the decedent's regular physician, and that he treated her injured arm at his office on July 2. She was told to return to the office on July 5 but, having become bedridden in the interval, Dr. Hantsoo went to her home instead on that day, and again on July 8, 12, 15, and 18. On July 21, having suffered a stroke, Mrs. Junes was taken to a hospital where she died on July 24.

Appellant called a medical witness, Dr. Chapman, who testified that the medical treatment accorded Mrs. Junes for her injury was deficient by reference to the applicable standards prevailing in the area, thereby prolonging unduly the baneful effect of the injury upon her. He also addressed himself to the relationship between these deficiencies and Mrs. Junes's subsequent death, asserting that they were "an aggravating factor in her demise."

Both Dr. Hantsoo and Dr. Wagner, the latter called as an expert by Safeway, testified that there was no such connection. Dr. Hantsoo said that the injury to the decedent's arm was infected and inflamed when she came to him on July 2, and that he gave that condition appropriate treatment. Its slow healing was due entirely, so he said, to her advanced age and to her chronically high blood pressure. In addition, the hospital rec-

ords at the time of her admission on July 21 contained no indication of anything wrong with her arm; and her temperature was then recorded as 98.4° F., suggesting no infection in her system.

The trial judge heard argument on appellees' motions to dismiss, and then took them under advisement. The orders of dismissal he subsequently entered do not identify in any way the precise reasons therefor, and, in the case of Safeway, do not refer to the existence of a general damage, as distinct from a wrongful death, claim. The comments made by the court just at the close of argument indicate, however, that its primary concern was with the question of whether the wound in the arm had anything to do with the death.[1]

## II

[1] If Safeway is properly chargeable at all with the injury to the decedent's arm, then it would be liable to her heirs for the general damages suffered by the decedent prior to her death, and, so the parties here appear to have assumed, for that death as well if intervening medical malpractice brought it about.[2] If it were guilty of no negligence whatever vis-a-vis the decedent, it would, of course, have no accountability on either score. Dr. Hantsoo, on the other hand, if negligent, would be liable only for his own alleged deficiencies in treatment, and then, under the terms of the complaint against him, only if those deficiencies were a cause of death of Mrs. Junes. It is not asserted that, apart

from Dr. Hantsoo's allegedly inadequate intervention, Safeway would have any liability for wrongful death. We turn, first, then, to the question of whether the case against Dr. Hantsoo should have gone to the jury.

The trial judge's remarks in the transcript, quoted above in note 1, suggest that it was the lack of evidence of causation, rather than of malpractice, which persuaded him to take the issue from the jury. The distinction, if such it was, is understandable. The expert witnesses differed on the adequacy of Dr. Hantsoo's treatment when measured by the relevant standard, but the testimony left that issue clearly in a posture appropriate for jury resolution. It is with respect to the question of causation that appellees take the strongest line here, as they did in the District Court.

They insist most strenuously that appellant's expert witness testified in a highly ambivalent manner and never actually stated unequivocally that the allegedly mistreated injury was a cause of death. The immediate cause was, of course, the stroke, and the problem here is cast in terms of the cause of the stroke. On this score there are a number of statements by Dr. Chapman that there was a relationship between the prolongation, due to inadequate treatment, of the consequences of the wound and the onset of the stroke. Appellees make much of a passage where, so they contend; Dr. Chapman admitted that he could not identify what causes a stroke. But that passage, set forth fully in the margin,[3]

---

1. "THE COURT: I am very reluctant to take a case away from a jury and I only would do it in this case because of the confusion existing in the evidence. The problem I am having is on the question of the cause of death and I think that you have to come to the conclusion in order to sustain the plaintiff's case that the wound received in the Safeway store and the subsequent treatment by the doctor was the proximate cause of plaintiff's death.

There is no question but that the record shows that the patient's temperature was normal when she came to the hospital and that she had already had a

stroke. That would indicate that the infection wasn't bothering then. The question in my mind is whether or not that would indicate that it was all over with, that all the infection was over. I don't know. I will give this some consideration."

2. See HARPER & JAMES, THE LAW OF TORTS § 20.3, at 1124 (1956); RESTATEMENT (SECOND) OF TORTS § 457 (1965).

3. "Q. Expressing your opinion within the realm of reasonable medical probability, what was the relationship between her death and the injuries she received, with the subsequent treatment by the physi-

ended in a coherent expression of opinion that there was a relationship of cause and effect between the care of the wound and the stroke.

[redacted] Appellees also stress what appears to have troubled the court in this regard, namely, the evidence that the decedent's temperature was normal at the time she entered the hospital, a fact tending to negate the existence at that time of the systemic infection which appellant's expert witness testified had been caused by the doctor's malpractice. This evidence, of course, might have weighed so heavily with the jury that it would have decided adversely to appellant, but it did not cancel out entirely the evidence offered by appellant on the causation issue—and the place for the weighing of these matters was in the jury room.[4] The court is not the only arm of the judicial process capable of common sense inferences from conflicting testimony, and juries have been known to serve as shields against improbable claims. In any event, it is to them that the weighing function has, for good or ill, been entrusted in a balance of evidence like the one presented by this record.[5]

cian you have delineated to the court and the jury? A. If I may give an explanation with my answer: there is a relationship, but I would like to, if I may—

Q. Explain what the relationship is. A. The exact cause of what we call a cerebral vascular accident you cannot specify or pinpoint—you cannot specify or pinpoint a cause that this item always causes stroke. We can list who is more likely to have a stroke or under what conditions, but it is very difficult to pinpoint one cause as the cause of strokes so that when we scrutinize this case—I was trying to determine if there was a reasonable relationship or any relationship here. My reasoning went this way.

MR. WELCH: I don't think that is a proper way to testify.

THE COURT: Sustained.

BY MR. FEISSNER: Would you answer the question? What is the relationship between the deficiencies of treatment and the ultimate demise within the realm of reasonable medical probability? A. Her failure to receive adequate treatment and promulgation [sic] of her illness during the period between the 5th of July and the 24th of July was an aggravating factor in her demise.

Q. Are you expressing that opinion within the realm of reasonable medical probability? A. Yes, sir."

4. In this regard, it is perhaps worth noting that, if the judge had permitted the case to go to the jury, appellant's counsel might well have discounted the weight of this evidence (1) by reminding the jury that immediately after entering the hospital the decedent's temperature again began to rise and (2) by arguing that even if the infection had subsided by July 21, this did not necessarily break the chain of causation which left decedent weak and susceptible to a stroke.

5. Two other errors in the conduct of the trial in relation to Dr. Hantsoo were urged upon us as requiring reversal. Since they involved rulings limiting the presentation of evidence by appellant, their determination now is not essential in the light of our reversal of the directed verdict. Since, however, the questions may arise again on a retrial, we notice them briefly. As to the first, Dr. Chapman was not permitted to respond to appellant's question as to what the "usual prognosis" of an injury of the kind suffered by Mrs. Junes would be. Although the exclusion here may have reflected a feeling by the court that the question as put was inadequately framed, we note only that the question in this form is normally proper. Chambers v. Tobin, 92 U.S.App.D.C. 274, 204 F.2d 732 (1953). If it is asked again, however, it should be carefully framed to include the age and physical condition of the decedent as well as the nature of her injury.

The second error is said to lie in the court's refusal to permit appellant to place Dr. Hantsoo's pretrial deposition in evidence before calling him as a witness. Although Rule 26(d) (1), FED.R.CIV.P. contemplates the use of a deposition only to *impeach* the deponent as a witness, Rule 26(d)(2) states that the deposition of a *party* may be used by an *adverse party* "for any purpose." Professor Moore states unequivocally, 4 FEDERAL PRACTICE ¶ 26.29, at 1653 (2d ed.1968), that this means that the deposition of an adverse party may be introduced as original evidence, and we agree with this reading. The trial court, of course, always retains a discretion to exclude repetitious matter and to require coun-

## II

We do not, as remarked above, know precisely why the trial judge directed a verdict for Safeway. It could have been because there was no evidence of causation, as seems likely from his final comments in the transcript.[6] It could also—and alternatively—have been because he thought Safeway's conduct to have been free of neglect in relation to appellant. This was urged during the argument upon the motions for directed verdicts, although in a seemingly subordinate role to the causation question. If the judge had had his attention called to the general damages count in the complaint against Safeway when he granted the motion, then in all logic he must have found no jury issue on negligence, since the issue of cause and effect was confined to the claim for wrongful death. What alone is clear is that he got no help from counsel by way of reminder of this distinction.

In this confused state we see no alternative but to deal with the negligence issue at this time.[7] Here again the issue is not whether Safeway was or was not negligent, but whether that determination was one to be made by the jury. Safeway's reliance is upon the absence of any evidence that it either knew or was chargeable with knowledge of the existence of the dangerous defect in the shopping cart. It points in this regard to the fact that appellant did not show how long the defect had been in existence; and it hypothesizes that the defect might have been caused by appellant's own carelessness in steering the cart.

The first of these seems to us to posit a higher standard of omniscience in its customers than Safeway ordinarily exacts from the millions of invitees it strives so assiduously, by every device of the advertising and merchandising art, to attract to its stores. There is nothing in the record to support the second. In any event, we do not regard either as justifying a ruling that, on the evidence adduced, Safeway was free of liability as a matter of law. The average housewife setting out for the supermarket does not expect to be wounded by a defect in one of the carts she is invited to use, and, in the unlikely event that she is, she hardly possesses the technical resources to enable her to demonstrate just how the defect came about and how long it has been in being.

On the other hand, the law does not make Safeway an absolute insurer against such happenings. It cannot guard against every contingency, and the individual shopper bears some of the risk of the hazards of life inside a supermarket as well as out. The question is, as always, what is a fair division of those risks under the particular circumstances; and the common experience and judgment of the community serve as a touchstone for its answer.

sel to identify in his offer the parts deemed relevant. *See, e.g.,* Merchants Motor Freight, Inc. v. Downing, 227 F. 2d 247 (8th Cir. 1955) ; Pursche v. Atlas Scraper and Engineering Co., 300 F. 2d 467 (9th Cir. 1961), cert. denied, 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962).

6. This reading, however, assumes that the judge was not aware that a general damages claim was still pending against Safeway which did not hinge upon evidence of causation of death.

7. Neither party has cited to the court cases directly in point. The case closest on the facts to the one at bar is Brady v. Great Atlantic and Pacific Tea Co.,

336 Mass. 386, 145 N.E.2d 828 (1957), where a broken strap on a shopping cart caused a baby to fall from the cart, and where there was no evidence as to what had caused the weakness of the strap. The court there upheld a verdict in plaintiff's favor on the ground that the jury could have found, and presumably did find, that the store was responsible for the torn strap. In this jurisdiction, the parties have focused primarily on the long series of slip-and-fall cases, the last of which is Seganish v. District of Columbia Safeway Stores, Inc., 132 U.S. App.D.C. 117, 406 F.2d 653 (1968), none of which is applicable to the state of facts at issue here.

Safeway sought, and was permitted, to show that it inspected its carts once a month at the time they were being cleaned, and that, in the experience of one of its veteran employees, defects of the kind in question occurred only infrequently. The jury might thus have concluded that Safeway's response to this danger was commensurate with its seriousness, and that Safeway had violated no obligation of reasonable care for appellant's safety. It might, on the other hand, applying its collective common sense to the facts, have thought that something more was required. This is not to allow the jury to speculate. It is to allow it to bring to bear on evidence which looks in different directions the practical wisdom and experience which has immemorially been thought to reside in the jury system.

The judgments of dismissal in both Nos. 21,556 and 21,557 are reversed and the cases remanded for further proceedings consistent herewith.

It is so ordered.